IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOSEPH LOGAN, Personal Representative )
of the Estate of Ralph Logan, Deceased, )
and LOIS LOGAN, )
 )
             Plaintiffs, )
 )
     v. )
 )     1:12-CV-1353
 )
AIR PRODUCTS AND CHEMICALS, )
INC., et al., )
 )
            Defendants. )

## MEMORANDUM OPINION AND ORDER
## AS TO DEFENDANT FOSTER WHEELER ENERGY CORPORATION

Catherine C. Eagles, District Judge.

    Ralph Logan, the plaintiffs' decedent, worked at a Getty Oil refinery for thirty years where he was exposed to asbestos on a regular basis. The defendant, Foster Wheeler Energy Corporation, sold boilers used at the refinery. Mr. Logan developed mesothelioma, a cancer caused by exposure to asbestos, which later caused his death. His estate and wife have sued a number of entities, contending that their products and conduct caused Mr. Logan's mesothelioma. Foster Wheeler has moved for summary judgment.[1] Because the plaintiffs have not offered sufficient evidence to prove that Mr.

---

[1] The Court previously granted uncontested motions for summary judgment as to several defendants and denied several other defendants' motions for summary judgment. (*See* Docs. 156, 158, 160, 161, 165.) The Court held open summary judgment motions as to Foster Wheeler

Logan was actually exposed to asbestos from a Foster Wheeler product or that Foster Wheeler had a duty to warn Mr. Logan about the risks of asbestos-containing replacement parts in a Foster Wheeler product, the Court will grant the motion.

### Background

The facts as stated are either undisputed or viewed in the light most favorable to the plaintiffs, the non-moving party.[2] Almost all relevant evidence comes from the testimony of Louis Pederson, Mr. Logan's former co-worker.

Mr. Logan worked as a maintenance supervisor at a Getty Oil refinery in Delaware from 1956 to 1986. (Doc. 127-1 at 11-12, 15.) The refinery covered 5,000 acres and included 980 miles of piping. (Doc. 127-1 at 170.) All the asbestos-containing equipment was outside. (Doc. 127-1 at 171.)

Many types of equipment at the refinery contained asbestos, and maintenance on this equipment would often involve removing and replacing asbestos-containing components. (*See, e.g.*, Doc. 127-1 at 22-26, 30-32, 35-41, 46-49, 62-66.) Every two to three years, "shutdowns" or "turnarounds"[3] would occur at the refinery and last for around thirty days, during which workers would turn off, inspect, and repair many pieces of equipment. (Doc. 127-1 at 41-44, 284-85.) Mr. Logan's responsibilities as

---

and another defendant, The William Powell Company, for the parties to file supplemental briefing. (Doc. 162.)

[2] Docket references for non-deposition evidence are to the docket number and page number appended by the CM-ECF system. For deposition evidence, page numbers refer to the actual page numbers of the deposition transcript.

[3] A turnaround appears to be the same thing as a shutdown. (*See* Doc. 127-1 at 174.)

maintenance supervisor generally required him to be present when workers serviced equipment, including pumps, compressors, valves, and boilers. (Doc. 127-1 at 15-19, 22-28, 35-48, 107-08.) During shutdowns, Mr. Logan would handle small parts like gaskets and valves and carry them to job sites. (Doc. 127-1 at 28-29.)

Mr. Pederson knew Mr. Logan because they both worked at the plant for twenty-eight years. (Doc. 127-1 at 168.) Mr. Logan began working at the refinery when it opened in 1956, and Mr. Pederson started in 1957. (Doc. 127-1 at 15.) They worked on the same team for only one year, around 1967 or 1968, (Doc. 127-1 at 168), but saw each other daily from 1972 to 1981 when Mr. Logan supervised the area that included the "crude unit," which Mr. Pederson supervised. (Doc. 127-1 at 173.) Otherwise, Mr. Pederson often observed Mr. Logan during shutdowns as part of training new employees or because he was just "interested in what was going on" during shutdowns. (Doc. 127-1 at 173-74.)

Mr. Pederson estimated there were "[f]ive hundred or so" heat exchangers located throughout the refinery. (Doc. 127-1 at 113.) In the "cat cracker" unit, two Foster Wheeler boilers were used as heat exchangers. (Doc. 127-1 at 104, 109.) These Foster Wheeler boilers were serviced and maintained "strictly on turnarounds." (Doc. 127-1 at 107.) During shutdowns, workers would open the doors to the boilers to check for and fix leaks and complete other maintenance and then scrape off and replace the asbestos rope gaskets that sealed the door. (Doc. 127-1 at 110-14.) Workers had to hand-cut the replacement rope. (Doc. 127-1 at 115.) This work created asbestos dust. (Doc. 127-1 at

3

111, 117-19.) Mr. Pederson estimated that Mr. Logan worked approximately twenty to thirty turnarounds of the Foster Wheeler boilers during his career.[4] (Doc. 127-1 at 108.)

There may have been more Foster Wheeler boilers on site,[5] (Doc. 127-1 at 106-07, 113), but Mr. Pederson's knowledge appears limited to the two boilers in the cat cracker unit. (Doc. 127-1 at 104, 307-08.) Mr. Pederson did not know when the boilers in the cat cracker unit were first serviced and thought the unit probably shut down in 1959 and 1962. (Doc. 127-1 at 310.) While neither Mr. Pederson's testimony nor his memory were completely clear about when he first observed Mr. Logan supervise work on the Foster Wheeler boilers in the cat cracker unit, it appears that it was probably during a shutdown in 1965 or 1966, and certainly no earlier than a shutdown in 1962. (Doc. 127-1 at 310.) In any event, Mr. Pederson never saw Mr. Logan do service work on these boilers himself; rather, Mr. Logan would supervise workers and "be in the area." (Doc. 127-1 at 110-11.)

The plaintiffs presented no evidence on the specific model of any boiler in the cat cracker unit[6] or on whether the Foster Wheeler boilers contained asbestos components[7]

---

[4] Mr. Pederson did not explain how Mr. Logan participated in twenty to thirty turnarounds over thirty years when such turnarounds only occurred every two to three years.

[5] When asked how many Foster Wheeler boilers were at the refinery, Mr. Pederson answered, "I would say ten or twelve. I really don't know." (Doc. 127-1 at 106-07.)

[6] Foster Wheeler has offered evidence that it did not supply boilers or heat exchangers to the Getty refinery, (*see* Doc. 137-3 at ¶¶ 5-8), but it accepts Mr. Pederson's testimony as true for purposes of this motion. (Doc. 137 at 5.)

[7] At one point in his deposition, Mr. Pederson testified that the asbestos-containing material in the Foster Wheeler boilers was asbestos rope. (Doc. 127-1 at 110.) Later, he called the

when originally installed in the refinery. Mr. Pederson testified that he could distinguish between asbestos and non-asbestos gasketing material and that the boilers in the cat cracker unit contained asbestos-containing gasketing material. (Doc. 127-1 at 312; *see also* Doc. 127-1 at 108.) But, Mr. Pederson believed the original gasketing material in the boilers would have been replaced in 1959, and he did not know the brand name or manufacturer of the replacement material, nor whether Foster Wheeler supplied the replacement material. (Doc. 127-1 at 311-12.)

Foster Wheeler often sold original equipment containing asbestos components, such as insulation, based on a buyer's specifications. (*See* Doc. 142-4 at 5-7.) Foster Wheeler also approved of several types of asbestos materials for use in its equipment, including asbestos rope for use in "steam generating units." (Doc. 142-5 at 3-4, 20.)

**Analysis**

The plaintiffs assert the following causes of action arising from Mr. Logan's alleged exposure to asbestos in Foster Wheeler boilers: negligence, gross negligence, wrongful death, loss of consortium, breach of implied warranty, fraud, failure to warn, and negligent hiring, training, and/or supervision. (Doc. 73.) The plaintiffs assert two theories of liability: (1) that Mr. Logan's mesothelioma was caused by exposure to asbestos in Foster Wheeler boilers as originally sold, and, in the alternative, (2) that even if the asbestos materials in its boilers were third-party replacement parts, Foster Wheeler

---

material gaskets. (Doc. 127-1 at 311.) It appears undisputed that asbestos rope acted as a gasketing material to seal the boiler doors. (*See* Doc. 127-1 at 24, 111, 252.) Mr. Pederson testified that the only possible source of asbestos in these boilers was the gasketing material. (Doc. 127-1 at 108.)

is liable for failing to warn Mr. Logan about foreseeable exposures to asbestos-containing replacement parts in its boilers. (Doc. 142 at 12.) Foster Wheeler has moved for summary judgment. (Doc. 138.)

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant satisfies its burden, the burden shifts to the non-movant to produce admissible evidence from which the fact-finder might return a verdict in his favor. *Anderson*, 477 U.S. at 257.

**1. Actual Exposure to Asbestos from Foster Wheeler Products**

In cases arising under North Carolina law, a plaintiff who develops asbestosis allegedly as a result of exposure to asbestos "must demonstrate that he was actually exposed to the alleged offending products." *Wilder v. Amatex Corp.*, 314 N.C. 550, 553-54, 336 S.E.2d 66, 68 (1985). It is not enough for a plaintiff "simply to show that [the offending] products were shipped to various job sites on which he worked." *Id.* at 554, 336 S.E.2d at 68. In *Wilder*, the North Carolina Supreme Court concluded that the plaintiff's evidence that he intermittently worked around the defendant's products for roughly fifteen years of his forty-year career was sufficient to create a question of fact on whether the plaintiff was actually exposed to the defendant's products. *Id.* at 552-54, 336 S.E.2d at 67-68. Neither party has suggested that this rule would not apply in a case where the plaintiff or her decedent developed mesothelioma.

Viewed in the light most favorable to the plaintiffs, Mr. Pederson's testimony amounts to evidence that Mr. Logan worked in the area of two Foster Wheeler boilers that had asbestos-containing gasketing material removed and replaced twenty to thirty times in thirty years. There is no evidence that the boilers contained asbestos-containing gaskets when sold by Foster Wheeler. Absent additional evidence, this is insufficient to allow a fact-finder to infer that Mr. Logan was exposed to asbestos from a Foster Wheeler product.

In support of their contention that the original Foster Wheeler boilers contained asbestos materials, the plaintiffs appear to rely on an affidavit that has been stricken, (*see* Doc. 142 at 4, 7; Doc. 179), Foster Wheeler interrogatory answers in an earlier, unrelated matter, and a Foster Wheeler insulation catalog. (Doc. 142 at 3-4.)[8] However, they do not direct the Court's attention to specific pages in these twenty-plus-page exhibits that support their contentions.[9] Based on the Court's review of these exhibits, they appear to say only that Foster Wheeler sold some products that contained asbestos, that Foster

---

[8] Possibly, the plaintiffs also rely on interrogatory answers in another case from Garlock, Inc., that state that Garlock's gaskets contained asbestos. (*See* Doc. 163 at 4-6.) However, Foster Wheeler is mentioned nowhere in the interrogatories, (*see* Doc. 142-8), and nothing indicates this evidence is at all connected to the Foster Wheeler boilers at the Getty refinery; thus, this evidence adds nothing.

[9] The Court is not required to scour the record to find support for a party's factual assertions. *See Hughes v. B/E Aerospace, Inc.*, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do."); *see also Stephenson v. Pfizer Inc.*, No. 1:13cv147, 2014 WL 4410580, at *1 n.1 (M.D.N.C. Sept. 8, 2014) (holding that the Court is not obliged to "investigat[e] the basis of claimed facts"); L.R. 56.1(d) (requiring that briefs filed in connection with summary judgment motions "point to specific, authenticated facts existing in the record"); L.R. 7.2(a)(2).

Wheeler would use asbestos products in its equipment when a buyer specified, and that Foster Wheeler approved of the use of asbestos rope in steam generating units.

In the interrogatories, for example, Foster Wheeler said that "[i]n some instances . . . the equipment or services provided by [Foster Wheeler] might have involved the use, application or procurement of asbestos products manufactured by others," (Doc. 142-4 at 15, and "[o]ftentimes, specifications [for asbestos components] were provided by the customer or client." (Doc. 142-4 at 6.) The catalog states that it "is to be used only for . . . consideration while furnishing bids, materials and/or services" to Foster Wheeler "during fabrication and installation of insulation on Foster Wheeler Steam Generating Units," (Doc. 142-5 at 3), and lists a variety of asbestos products, including asbestos rope. (Doc. 142-5 at 4-9, 14-22.) Perhaps one can infer that a "steam generating unit" is the same as or similar to a boiler or heat exchanger. (*See* Doc. 127-1 at 113-14 (describing some operations of "exchangers" as involving steam).) Even so, this evidence only shows that some Foster Wheeler boilers may have contained asbestos components if a buyer requested them and does not show that the boilers at the Getty refinery contained asbestos-containing gaskets or rope when sold by Foster Wheeler.

Even if the Court were to assume the original boilers contained asbestos, Mr. Pederson was not present during the first shutdown in 1959 and thus cannot testify as to Mr. Logan's specific role during that shutdown, nor can he testify as to whether Mr. Logan was near the two Foster Wheeler boilers in the cat cracker unit when workers removed and replaced the gasketing material during that shutdown. For subsequent shutdowns, Mr. Pederson said workers would have removed replacement gasketing

8

material, (*see* Doc. 127-1 at 248)—material from an unknown manufacturer and not linked to Foster Wheeler. (Doc. 127-1 at 311-12.)

Thus, the plaintiffs have presented no evidence from which a fact-finder could infer that the two Foster Wheeler boilers in the cat cracker unit contained asbestos gaskets when sold by Foster Wheeler and no evidence that Mr. Logan was exposed to asbestos from these boilers. Absent such evidence, Foster Wheeler is entitled to summary judgment. *See Wilder*, 314 N.C. at 553-54, 336 S.E.2d at 68 ("[P]laintiff's evidence must demonstrate that he was actually exposed to the alleged offending products."); *see also Mullis v. Armstrong Int'l, Inc.*, No. 2:12-60155-ER, 2013 WL 5548838, at *1 n.1 (E.D. Pa. Aug. 20, 2013) (granting summary judgment for the defendant in a case applying North Carolina law because the plaintiff did not present evidence of exposure to asbestos from a product made or supplied by the defendant, as opposed to a replacement product made and supplied by another entity); *Agner v. Daniel Int'l Corp.*, No. 3:98CV220, 2007 WL 57769, at *4 (W.D.N.C. Jan. 5, 2007) ("The failure to specifically identify a defendant's presence warrants a grant of summary judgment.").

The plaintiffs contend that because Mr. Logan developed mesothelioma, the Court should apply a "relaxed *Lohrmann* test."[10] (Doc. 144 at 10-12.) Whatever the merits of

---

[10] *See Mullis*, 2013 WL 5548838, at *1 n.1 (collecting and rejecting cases applying a "modified or adjusted" *Lohrmann* test in mesothelioma cases as inconsistent with a prediction that the North Carolina Supreme Court would adopt the *Lohrmann* test); *see also Ford Motor Co. v. Boomer*, 736 S.E.2d 724, 728-33 (Va. 2013) (rejecting the "substantial factor" test in *Lohrmann* under Virginia law in mesothelioma case).

9

this argument as to causation, it has no merit as to exposure, for the reasons stated by the Court in connection with the summary judgment motion of another defendant in the case. (*See* Doc. 180 at 8-9.) In summary, the *Lohrmann* test cannot be modified to such an extent that the plaintiffs do not have to prove actual exposure to asbestos from the defendant's product; that would be inconsistent with *Wilder*, a North Carolina Supreme Court case almost directly on point.

### 2. Liability Based on Failure to Warn

The plaintiffs next contend that even if the asbestos materials in Foster Wheeler boilers were installed after Foster Wheeler sold the boilers to the refinery and were made and supplied by others, Foster Wheeler should be liable for failing to warn users about foreseeable exposures to asbestos-containing replacement parts. (Doc. 142 at 12.)

In cases arising under North Carolina law, to create a jury question in a products liability action under a failure to warn theory, a plaintiff must present sufficient evidence that: (1) the manufacturer or seller of a product acted unreasonably in failing to provide a warning or instruction; (2) the failure was a proximate cause of the harm; and (3) either, when the product left its control, the manufacturer or seller knew or should have known that the product posed a substantial risk of harm to a reasonably foreseeable user, or, after the product left its control, the manufacturer or seller became aware or should have become aware that the product posed a substantial risk of harm to a reasonably foreseeable user or consumer. *Evans v. Evans*, 153 N.C. App. 54, 57-58, 569 S.E.2d 303, 305-06 (2002) (citing N.C. Gen. Stat. § 99B-5(a)).

10

The plaintiffs contend that (1) Mr. Logan was a foreseeable user of the Foster Wheeler boilers because he supervised the replacement of the gasketing material, (Doc. 142 at 4, 12), and (2) the use of asbestos-containing replacement gaskets in Foster Wheeler boilers was foreseeable. (Doc. 142 at 12-14.) The plaintiffs contend that these two facts, taken together, imposed on Foster Wheeler a duty to warn Mr. Logan about the dangers of asbestos.

Neither party appears to dispute that Mr. Logan was a foreseeable user of the boilers. The issue here turns on the foreseeability of Getty's use of asbestos-containing replacement parts in the Foster Wheeler boilers. In support of their contention that Foster Wheeler knew or should have known that Getty would make such use, the plaintiffs assert that "the normal use of Foster Wheeler boilers involved the use of asbestos gaskets and rope," (Doc. 142 at 13), that "Foster Wheeler specified the use of asbestos rope and gaskets," and that "the use of these asbestos materials was specified and integrated into Foster Wheeler boilers." (Doc. 142 at 14.) If the plaintiffs presented evidence on even one of these assertions, perhaps this would be sufficient to give rise to a disputed question of material fact, but they have not.

In their recitation of facts, the plaintiffs rely on an affidavit of Walter Newitts for the assertion that Foster Wheeler specified the use of asbestos in all boilers after the late 1950s. (Doc. 142 at 4.) That affidavit has been stricken. (*See* Doc. 179.) The plaintiffs also maintain that the Foster Wheeler insulation catalog contains "information about asbestos rope and its use on Foster Wheeler boilers" and shows that Foster Wheeler approved of and recommended its use. (Doc. 163 at 3-4.) The Court is unable to confirm

11

this assertion beyond the mere existence of the words "asbestos rope" in the catalog, (Doc. 142-5 at 4, 20), and references to "steam generating units," (Doc. 142-5 at 3), which might be boilers or heat exchangers. To the extent the plaintiffs rely on the Foster Wheeler interrogatory answers, that evidence merely establishes that Foster Wheeler sold some products that contained asbestos and that Foster Wheeler would use asbestos products in its equipment when a buyer specified.[11] In any event, nothing connects the products referenced in the catalog or interrogatories to the specific kind of boilers in the cat cracker unit at the refinery. To infer such a connection would be to speculate.

In summary, the plaintiffs have not proffered sufficient evidence that shows Foster Wheeler knew or should have known that Getty would use asbestos-containing replacement parts in the two Foster Wheeler boilers in the cat cracker unit, much less that Foster Wheeler required or recommended such use. *See Evans*, 153 N.C. App. at 57-58, 569 S.E.2d at 306; *see also* N.C. Gen. Stat. § 99B-5(a). Given the lack of evidence on the foreseeability of Getty using asbestos-containing replacement parts in Foster Wheeler boilers, the plaintiffs cannot prove that Foster Wheeler had a duty to warn Mr. Logan about the dangers of asbestos.

## Conclusion

The plaintiffs have offered insufficient evidence to raise a disputed question of material fact as to whether Mr. Logan was exposed to asbestos from a Foster Wheeler

---

[11] As noted *supra*, to the extent the plaintiffs rely on the Foster Wheeler interrogatory answers and insulation catalog, they have failed to specifically identify the parts of those multi-page exhibits that support their assertions.

product or as a result of Foster Wheeler's failure to warn.  For this reason, it is

**ORDERED** that the motion for summary judgment by the defendant Foster Wheeler Energy Corporation, (Doc. 138), is **GRANTED**.

This the 7th day of November, 2014.

                                                  UNITED STATES DISTRICT JUDGE